EVALUATION SYSTEMS, INC.,
Plaintiff,

v.

AETNA LIFE INSURANCE
COMPANY, Defendant.

AETNA LIFE INSURANCE COMPANY,
Counterplaintiff,

v.

EVALUATION SYSTEMS, INC. and
Vreni Naess, Counterdefendants.

No. 82 C 5591.

United States District Court,
N.D. Illinois, E.D.

Dec. 23, 1982.

Thomas P. Aiello, Elliott, Carrane, Freifeld & Uruba, Chicago, Ill., for plaintiff.

Jill B. Berkeley, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Evaluation Systems, Inc. ("Evaluation Systems") sues Aetna Life Insurance Company ("Aetna"), seeking recovery of (1) $75,000 in insurance proceeds (Count I) and (2) statutory damages under Illinois Insurance Code § 155 (Ill.Rev.Stat. ch. 73, § 767) for Aetna's "vexatious and unreasonable" refusal to pay (Count II). Two motions have been submitted and briefed by the parties:

1. Aetna's under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss Complaint Count II; and

2. Evaluation Systems' under Rule 9(c) to strike Aetna's Answer to Complaint ¶¶ 10 and 12.

For the reasons stated in this memorandum opinion and order, Aetna's motion is denied and Evaluation Systems' is granted.

### Facts[1]

On November 20, 1979 Aetna issued to Evaluation Systems as beneficiary a $75,000

---

1. There is no dispute as to the principal facts. This account reflects allegations of (1) the

Complaint (not controverted in Aetna's Answer) and (2) Aetna's Answer (not denied by

policy (the "Policy") insuring the life of one of the Evaluation Systems partners, Per L. Naess ("Naess"). No question exists as to the propriety of Evaluation Systems' annual premium payments ($516.75 and $563.25, respectively) for the first two years of coverage. For the next year (beginning November 20, 1981), however, Evaluation Systems mistakenly again paid $563.25 rather than the $613.50 called for by the Policy.[2]

Aetna received and cashed the $563.25 check. It then sent Evaluation Systems a December 1, 1981 form letter:

> Thank you for your payment of $563.25. To pay the current premium due, an additional payment of $50.25 is needed. Enclosed is a self-addressed envelope for your convenience.
>
> Once we receive your additional payment, we will apply your checks to pay your November premium due of $613.50.
>
> If we can be of any further assistance, please contact us.

Unfortunately the letter was mailed to Evaluation Systems' old address (the one listed in the Policy application).[3] Consequently the letter never reached Evaluation Systems, but was returned to Aetna with the statement "Moved 3 yrs. ago" written on the envelope.

At that point Aetna made no further effort to locate Evaluation Systems, which (from the incomplete information now before the Court) had apparently relocated from Chicago to a Chicago suburb. Instead Aetna mailed the original letter to Naess, whose home address had also been listed in the Policy application. In response Naess'

wife Vreni wrote Aetna December 15, 1981 that one of the three Evaluation Systems partners had previously ousted the other two (including Naess) from the company. She asked whether "any regulation on your books" prevented continuation of insurance under those circumstances.

Aetna's next move (two months later) was to send a "Notice of Lapse" to the *same* former Evaluation Systems address it had already been told was wrong by the postal authorities. Its February 19, 1982 letter read in part:

> The annual premium of $613.50 due November 20, 1981 was not received by us within the time allowed for payment.
>
> Consequently, protection has ceased in accordance with the terms of the policy.

Not surprisingly, this letter too never reached Evaluation Systems.[4]

On the same date Aetna sent the second letter, it mailed a $563.25 refund check to a different (but also incorrect) address that had been provided Aetna by its Chicago office. Nothing about any claimed lapse accompanied the check. Rather the non-negotiable stub attached to the check read:

> Due to the partnership being dissolved we are refunding payment.

As was the case with the two letters, Evaluation Systems never received the refund check.

Sometime before June 1, 1982 "an oral inquiry was made by the owner [Evaluation Systems] concerning the lapse of the policy" (Aetna Counterclaim ¶ 14, admitted by

---

Evaluation Systems and specifically confirmed by Aetna's documentary exhibits). As will be apparent, the parties' factual submissions to this point are patchy and fragmented in some important respects.

**2.** Because the Policy provided one-year renewable and convertible term coverage, the premiums increased each year in the amounts stated in a table in the "Policy Specifications" section.

**3.** Nothing in either party's submissions indicates whether Aetna had previously been apprised of Evaluation Systems' change of address, either by transmittal of the current (or prior) premiums or otherwise.

**4.** Aetna's Counterclaim exhibits include an envelope with the handwritten legend "Moved out 2 yrs. ago." Unlike the earlier envelope mentioned in the text, it is not referred to in the body of the Counterclaim. From its placement in the sequence of Counterclaim exhibits, it might be assumed the envelope had enclosed the refund check next referred to rather than the contemporaneous "Notice of Lapse." That seems unlikely, given the stop payment later placed on the check, so Aetna must simply have put the envelope in the wrong sequence among the exhibits.

Evaluation Systems).[5] By a June 10, 1982 letter to Evaluation Systems' correct address, an Aetna official outlined the course of events already described in this opinion. That letter concluded by saying a stop payment had been placed on the uncashed February 19 check, and a replacement check would be sent to Evaluation Systems in about three weeks.

But Naess had just died one day before the June 10 letter. Evaluation Systems of course refused to accept the replacement premium refund check (issued by Aetna June 15, 1982). It furnished Aetna with the requisite notice and proof of Naess's death and requested payment of its $75,000 claim.

To make the plot thicker, on July 21, 1982 counsel for Vreni Naess wrote Aetna requesting payment of the insurance proceeds to his client. That letter asserted (1) Evaluation Systems had offered in the fall of 1980 to let the Naess family take over the policy and substitute Vreni Naess as beneficiary, (2) that offer had been accepted and Aetna had been so notified and (3) the Naess family had tendered a premium payment and executed Aetna's change of beneficiary form.

To date Aetna has refused to pay either Evaluation Systems or Vreni Naess any insurance proceeds. After Evaluation Systems brought this action against Aetna, Aetna filed a counterclaim against both Evaluation Systems and Vreni Naess as administratrix of Naess's estate. It seeks a declaratory judgment that Evaluation Systems' failure to pay the full annual premium relieved Aetna of any obligation to pay the insurance proceeds to either counterdefendant.

### Complaint Count II

Illinois Insurance Code § 155 ("Section 155") provides:

In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $5,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

Complaint Count II charges Aetna's refusal to pay the $75,000 claim was "vexatious and unreasonable" because Aetna lacked any legal justification for doing so. Evaluation Systems' argument to that effect rests on the following asserted interplay of Policy provisions and Illinois case law:

1. Under the Policy's "Premiums and Reinstatement" section:

Premiums may be paid annually, semi-annually, quarterly, or with Aetna's consent, monthly at the rates in effect on the Date of Issue. A change to any such frequency will take effect when Aetna accepts the premium for the changed frequency. If any premium is not paid when due or within the grace period [31 days], this policy will terminate, subject to the sections of this policy entitled "Reinstatement."

Evaluation Systems could unilaterally alter the frequency of premium payments from an annual to a semi-annual or quarterly basis.[6]

---

5. Nothing before the Court explains what triggered that inquiry, although the circumstances might obviously be relevant to the issues in this litigation.

6. Aetna's consent is literally required only if the Policy Owner wants a monthly premium schedule. Arguably Aetna can also veto the Policy Owner's change to any payment schedule by simply refusing to "accept the premium for the changed frequency."

2. Illinois authorities unanimously hold—as a matter of law—an insurance company "accepts" a premium check by retaining its proceeds for a significant period. Any subsequent refund of the premium will not undercut the finding of acceptance.

3. By immediately negotiating the $563.25 premium check and then retaining the proceeds for a number of months, Aetna "accepted" the partial premium payment. It therefore became obligated to provide coverage for that portion of the Policy year (beginning November 20, 1981) equal to the ratio of the partial payment to the annual premium charge of $613.50. Such coverage extended well beyond the date Naess died.

Aetna's Motion To Dismiss contends Count II fails to disclose any "vexatious and unreasonable" conduct on its part because:

1. There is no allegation of any bad faith or sinister motivations underlying Aetna's refusal to pay Evaluation Systems.

2. All the facts as to Aetna's acceptance of the partial premium payment confirm the reasonableness of its refusal to pay.

Neither argument renders Count II legally deficient.

Aetna's first contention requires a review of the statutory and case law developments that led to the current version of Section 155. Originally the section made insurers whose refusal to pay a claim was "vexatious and without reasonable cause" liable *only* for "reasonable attorney fees" not to exceed any of three prescribed amounts (the first and third ceiling amounts were identical to subparagraphs (a) and (c) in the current statute, while the second maximum amount was only $500).

Without even addressing the preemptive implications of the statutory remedy, the Fifth District Appellate Court recognized an independent tort action against insurers for breach of their implied duty of good faith and fair dealing. *Ledingham v. Blue Cross Plan for Hospital Care,* 29 Ill.App.3d 339, 330 N.E.2d 540 (5th Dist.1975). *Ledingham* has had a mixed reception in the other Illinois Appellate districts. Both the First and Third Districts have disapproved of *Ledingham,* concluding the original Section 155 foreclosed any judicial enhancement (via common law tort remedy) of recovery for vexatious delay. *Tobolt v. Allstate Insurance Co.,* 75 Ill.App.3d 57, 30 Ill.Dec. 824, 393 N.E.2d 1171 (1st Dist.1979); *Debolt v. Mutual of Omaha,* 56 Ill.App.3d 111, 13 Ill.Dec. 656, 371 N.E.2d 373 (3d Dist.1978). *Tobolt* also found the 1977 amendment to Section 155 (its current version) also manifested a legislative intent to preempt the field.[7] However the Fourth District has endorsed the availability of *Ledingham*'s tort remedy in cases to which the amended Section 155 cannot be retroactively applied (it has not yet ruled whether the present Section 155 has preemptive effect). *Lynch v. Mid-America Fire & Marine,* 94 Ill.App.3d 21, 49 Ill.Dec. 567, 418 N.E.2d 421 (4th Dist.1981). And the Second District has said a tort remedy for compensatory damages may lie despite Section 155. *Hoffman v. Allstate Insurance Co.,* 85 Ill. App.3d 631, 40 Ill.Dec. 925, 407 N.E.2d 156 (2d Dist.1980).

Obviously the *Ledingham* tort avoided the exceedingly narrow scope of sanctions imposed by original Section 155. It may even have been devised for that purpose. There is a difference of view as to its continued viability.[8] But whether or not it

7. As the statute makes plain, the insurer's liability for vexatious conduct was augmented by:

(1) permitting it to be taxed for *all* "reasonable attorney fees" without limitation as to amount;

(2) structuring the amount defined by the three subsections as a possible *addition* to attorney fees (effectively a penalty), rather than as the measure of the fee award itself; and

(3) increasing the second alternative ceiling in that add-on figure from $500 to $5,000.

8. Confronted with the conflict among the Illinois Appellate Courts, this Court's colleague Judge Marshall (employing the "Supreme-Court-predictive" approach) recently concluded Section 155 did not preempt the *Ledingham* tort. *Kelly v. Stratton,* 552 F.Supp. 641 (N.D. Ill.1982).

does, the significant fact for current purposes is that the gravamens of the two offenses differ markedly.

■ Under the tort theory the insurer's bad intent is an essential component of its actionable conduct. *See Ledingham,* 29 Ill. App.3d at 345–46, 330 N.E.2d at 545 (tort consists of "threatened and actual bad faith refusals to make payments under the policy, maliciously employed by [the insurer] in concert with false and threatening communications directed to [the beneficiary] for the purpose of causing him to surrender his policy or disadvantageously settle a non-existent dispute") (quoting *Fletcher v. Western National Life Insurance Co.,* 10 Cal. App.3d 376, 401, 89 Cal.Rptr. 78, 93 (1970)). By contrast Section 155 appears to focus on the objective reasonableness of the insurer's refusal to pay. Use of the word "unreasonable" itself suggests the applicability of an objective standard. As for "vexatious," it too is defined in Black's Law Dictionary (5th ed. 1979) as "Without reasonable or probable cause or excuse." [9]

■ In that light, and with all reasonable inferences drawn in its favor, Count II withstands Aetna's motion to dismiss. It is certainly arguable from the Policy terms that once Aetna "accepts" a partial premium payment that exceeds a quarterly premium, it is contractually bound to provide coverage for the corresponding portion of the Policy year.[10] Controlling Illinois authorities have all inferred acceptance from the following circumstances:

1. retention of the premium check for three or more weeks;

2. eventual cashing of the check; and

3. only a later refunding of the payment.

*See, e.g., Van Hulle v. State Farm Mutual Automobile Insurance Co.,* 44 Ill.2d 227, 231–32, 254 N.E.2d 457, 460–61 (1969); *Krumwiede v. Bankers Life & Casualty Co.,* 95 Ill.App.3d 861, 864, 51 Ill.Dec. 331, 333, 420 N.E.2d 745, 747 (3d Dist.1981). A fortiori Aetna accepted the $563.25 premium check by cashing it immediately and retaining the proceeds for some three months before attempting to refund the payment.

This is not the time to resolve open factual issues—or legal issues that might be posed by resolution of any facts adversely to Evaluation Systems. Under favorable inferences drawn from the facts alleged in Count II, Aetna's refusal to pay Evaluation Systems could be viewed as lacking legal foundation and hence as "vexatious and unreasonable." [11]

While Count II's underlying claim survives Rule 12(b)(6) attack, its prayer for relief is partially defective. Evaluation Systems seeks (1) $75,000 in insurance proceeds, (2) reasonable attorney fees and (3) an additional amount equal to 25% of the $75,000 insurance claim. That last item exceeds the $5,000 ceiling set by Section 155. It is accordingly stricken and replaced by a request for $5,000.

---

9. Neither of the parties nor this Court has found any Illinois case elaborating on the meaning of "vexatious." Black's also cites a "vexatious delay" insurance case from Missouri for a "willful and without reasonable cause" standard—again not appearing to require bad faith.

10. Several questions remain unanswered at this stage. Quarterly premiums are of course somewhat higher than one-fourth the annual premiums (because of the cost of the use of money). Evaluation Systems' inadvertently inadequate annual payment was not precisely equal to a different frequency payment "at the rates in effect on the Date of Issue" (the policy language). And under the Policy's literal terms Evaluation Systems could not unilaterally switch to a frequency other than semi-annually or quarterly. Accordingly its theory of "insur-

ance coverage for a proportionate period of the policy year" (Complaint ¶ 9) is untenable. But $563.25 is unquestionably greater than three quarterly premium payments for the Policy year beginning November 20, 1981. Three quarters of coverage would have carried the Policy beyond Naess's date of death.

11. Aetna's Counterclaim does allude to a different possible legal justification for its refusal to pay Evaluation Systems: its uncertainty as to whether Evaluation Systems or Naess's estate is the Policy beneficiary. Again a number of critical facts are lacking, and neither party addressed whether a bona fide dispute existed on that score. This Court has therefore ignored that possibility in disposing of Aetna's motion to dismiss.

*Aetna's Answer*

■ Complaint ¶¶ 10 and 12 allege Evaluation Systems duly complied with every condition of the Policy. In response Aetna's Answer asserts a general denial.

Evaluation Systems says that general denial contravenes Rule 9(c):

In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity.

Aetna counters that the particular basis for the general denial—Evaluation Systems' failure to pay the full annual premium in advance—is set forth in its answers to other Complaint paragraphs. That response is unpersuasive, for Evaluation Systems is entitled to be apprised "specifically and with particularity" whether or not Aetna claims any other deficiencies in Evaluation Systems' performance under the Policy. Aetna's answers to the two paragraphs must be stricken.

*Conclusion*

Aetna's motion to dismiss Complaint Count II is denied, but the prayer for relief in that Count is modified to the extent stated in this opinion. Aetna's answers to Complaint ¶¶ 10 and 12 are stricken. It is ordered to file amended answers to those paragraphs and to answer Count II on or before December 30, 1982.