**FORT HOWARD PAPER COMPANY, Plaintiff,**

v.

**STANDARD HAVENS, INC., et al., Defendants.**

No. 85–C–1293.

United States District Court, E.D. Wisconsin.

March 14, 1988.

Michael E. Husmann, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff.

Byron J. Beck, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Overland Park, Kan., Michael McCauley, Kathryn Coates, Quarles & Brady, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

WARREN, Chief Judge.

Plaintiff Fort Howard Paper Company ("Fort Howard") bought an air pollution control device called a baghouse from defendant Standard Havens, Incorporated ("Standard Havens"). Pursuant to a 71-page written contract, Standard Havens designed, manufactured and installed the baghouse. The baghouse, however, did not work to the satisfaction of Fort Howard and on August 30, 1985, Fort Howard brought suit stating a cause of action in contract for breach of warranty. The case was tried to a jury during three weeks of September, 1987. On September 30, 1987, the jury returned a 13–question Special Verdict.[1] Four of the questions dealt with the issues of hindrance and misuse. Those issues were the subject of motions raised by Fort Howard prior to trial and at the close of testimony. The Court reserved ruling on both occasions.

The issue raised by Fort Howard was whether hindrance and misuse had been properly pled by Standard Havens so as to make them issues for trial. Since the Court now holds that the Special Verdict questions were improperly placed before the jury, the Court hereby grants Fort Howard's motion for a new trial.[2]

### I.

Fort Howard is a Wisconsin corporation engaged in the business of manufacturing and selling paper products. Its principal place of business is in Green Bay, Wisconsin. Standard Havens, Inc. is a corporation incorporated under the laws of the State of Missouri with its primary place of business in Kansas City, Missouri. Standard Havens is engaged in the business of designing, manufacturing and selling air filtration systems. Also a party to this lawsuit was Continental Casualty Company, an Illinois corporation. Continental Casualty was named as a defendant due to a Performance Bond it held as security for the contract entered into between Fort Howard and Standard Havens.

Fort Howard's complaint alleged, in part, that the baghouse failed to comply with the Pressure Drop Warranty of the contract. Complaint at paragraphs 9, 13. The complaint also stated, in part, that Fort Howard had performed all of the obligations imposed upon it by the contract. *Id.* at paragraph 12.[3] Standard Havens' answer responded to paragraph 12 of the complaint, with the following:

> Defendant Standard Havens denies each and every allegation contained in Paragraph 12 of plaintiff's Complaint

1. The Special Verdict as answered by the jury is set forth in Appendix A of the *Decision and Order.* Questions No. 3(h), (i), (j), (k), (m), (n), (o), (p) and (r) were answered by the Court on a motion for directed verdict.

2. Presently pending before the Court is a motion by Standard Havens for entry of judgment. Also pending is a motion by Fort Howard for entry of judgment or in the alternative for a new trial. The Fort Howard motion again raises objections on the hindrance and misuse de-

fenses. The motion raises other grounds for a new trial as well.

Based on the decision herein, the motions for entry of judgment are denied. The motion for new trial is granted on the grounds explicitly set forth above. No ruling is made as to the other issues raised by Fort Howard.

3. Paragraph 12 of the Complaint, in its entirety, reads: "Fort Howard has performed all of the obligations imposed upon it by the contract."

and Standard Havens states specifically and with particularity that Fort Howard has failed to perform obligations imposed upon it under the Contract, including but not limited to the following:

(a) operation of the equipment in accordance with Standard Havens' instructions and manuals;

(b) sufficient maintenance of the equipment;

(c) operation of the equipment under substantially different conditions than those stated in the specifications;

(d) operation of glass bags on the mesh cages supplied by Standard Havens;

(e) approval by Standard Havens of the specifications on replacement bags furnished by Fort Howard;

(f) operation of the coal fired boiler application at or below the conditions with the fuels shown in Section I.2 of the Contract, and in accordance with Standard Havens' written instructions and manuals;

(g) operation of the boilers in accordance with the boiler supplier's written instructions and manuals;

(h) operation of the equipment in accordance with the application and sizing specifications of Section I.2 of the Contract;

(i) operation of the coal and waste fired boiler application at or below the gas volume stated within the Contract;

(j) maintenance of reasonable operating and maintenance records on boiler operation, baghouse operation and bag failure;

(k) performance of emission test within ninety (90) days of the total flue gas system being available for full load operation, or February 28, 1985, whichever occurs first;

(l) notification of Standard Havens of the emission testing schedule one (1) week prior to actual testing, allowance of Standard Havens to be present during emission testing and to review the emission test data;

(m) notification of Standard Havens, promptly and in writing, of any alleged

failure of the baghouse to perform as warranted;

(n) operation of the equipment at or below the following maximum design conditions:

1. 275°F—425°F;

2. 771,981 actual cubic feet per minute gas flow (maximum);

3. 20 percent by volume moisture in gas (maximum);

4. 3.5 gr/acf maximum dust loading;

5. 110 psig minimum air pressure, as measured at the compressed air header;

6. five (5) foot or less dust level in hoppers, as measured above the hopper discuarge;

(o) maintenance of reasonable operating and maintenance records to verify boiler operations, baghouse operation, and bag failure data;

(p) notification of Standard Havens of pressure drop testing schedule one (1) week prior to actual testing allowance of Standard Havens to be present during testing and to review test data;

(q) notification of Standard Havens in writing within a reasonable time after the discovery of any alleged defect; and

(r) all other requirements of the Contract which have not been performed by Fort Howard.

Answer, at paragraph 9. As an "Additional, Alternative and Affirmative" defense, Standard Havens alleged:

Defendant Standard Havens states that plaintiff has failed to fulfill its obligations under the contract.

*Id.*, at paragraph 19.

Standard Havens also counterclaimed for money allegedly still owing on the contract, for money allegedly owing on spare parts, and for money allegedly owing on certain field service work. *Id.* at pp. 8–12.

Subsequent to the filing of its counterclaim, Standard Havens sought leave to file a First Amended Answer and Counterclaim. Standard Havens sought to add a counterclaim of fraud in connection with the formation of the contract. In a *Deci-*

*sion and Order* dated February 10, 1987, the Court denied leave to amend, holding that the fraud claim would be subject to a valid motion to dismiss. In a *Decision and Order* dated July 1, 1987, the Court denied Standard Havens' motion for reconsideration of the February 10 order or, in the alternative, to modify the order making it ripe for interlocutory appeal.

Pursuant to the Court's standing Order Prior to Final Pretrial Conference Civil Cases, a final pretrial report was prepared by Fort Howard.[4] That report included a statement of issues. As to Fort Howard's complaint, three areas were identified by the parties: (1) what conditions must be fulfilled for the pressure drop warranty to exist; (2) when must the conditions be met; and (3) were the conditions met. The parties, however, disputed two specific points of inquiry within the three issues. Under the question of what conditions must be fulfilled for the pressure drop warranty to exist, Standard Havens sought to raise the issue of whether the burning of fuel oil, poly wrap, crank case oil, inks, binder and other chemicals in the boilers voided the warranty. Under the question of whether the conditions were met, Standard Havens also sought to raise the issue of whether the warranty was rendered null and void by burning fuel oil, poly wrap, crank case oil, inks, binder and other chemicals in the

boilers. Fort Howard objected to the inclusion of this issue unless Standard Havens could identify the section or sections of the contract which (1) precludes the burning of these wastes and (2) voids the pressure drop warranty.[5]

As the Court recalls, the inclusion of these additional points was hotly contested by the parties at the final pretrial conference.[6] The Court noted to the parties that the issue was one that should have been raised in a summary judgment motion and inquired as to why such a motion had not been made. The Court does not recall receiving a satisfactory response from either party. In fact, the Court had to set a briefing schedule and oral argument date for the dispute. Due to the fact that the final pretrial conference was held less than three weeks before trial, the briefing schedule ran almost to the day of trial. Oral argument on the motions was held the morning of trial.

Fort Howard filed its motion to exclude the additional issues in the form of a motion in limine. Standard Havens responded with a brief, to which Fort Howard replied with a brief of its own.

At oral argument on the morning of trial, it became more apparent to the Court that the issue was one that should have been considered in summary judgment form.

4. The Court's standing pretrial order reads as follows:

**ORDER PRIOR TO FINAL PRETRIAL CONFERENCE CIVIL CASES**

Pursuant to Rule 16(d) of the Federal Rules of Civil Procedure, it is hereby ORDERED that, in anticipation of trial, the parties shall prepare a joint final pretrial report. Counsel for the plaintiff(s) shall bear principal responsibility for the actual production of the report, which is due three (3) days before the final pretrial conference and must be signed by counsel for all parties. Failure to file a timely report will expose counsel and the parties they represent to sanctions.

The report shall include the following:
1. A statement of the issues in the case.
2. A statement of any uncontested facts. If the case is scheduled for a jury trial, this statement will be read to the jury. If the parties cannot agree on uncontested facts, this should be stated.
3. The names and addresses of all witnesses the parties expect to call to testify. A witness not listed will not be permitted to

testify except on rebuttal or upon a strong showing of surprise.
4. If expert witnesses are to be used, a narrative statement of the experts' backgrounds and experiences.
5. A list of all exhibits to be offered at trial. Exhibits should be marked and numbered prior to trial. On the first day of trial, the parties shall submit a register of proposed exhibits to the clerk.

/s/ ROBERT W. WARREN
UNITED STATES
DISTRICT JUDGE
Rev. 6/85

5. Plaintiff's cover letter to the Final Pretrial Report, at p. 2. (Docketed as filing No. 57, filed August 2, 1987).

6. The Court's final pretrial conferences are generally held without a court reporter; as such, no transcript was made of the discussions in the case at hand.

Furthermore, the Court concluded that it was not a dispute that lent itself to an easy resolution from the bench. As such, the Court took the motion under advisement and proceeded with trial. Certain testimony on the issues of burning of wastes and the voiding of the warranty was conditionally received.

Pursuant to the practice of the Court, both .parties submitted proposed special verdicts and jury instructions at or near the start of trial. Standard Havens' proposed instruction No. 9 was titled, "HINDRANCE OR INTERFERENCE WITH PERFORMANCE." [7] The instruction was a modification of Wisconsin Civil Jury Instruction 3060. In essence the instruction states that every contract contains an implied promise that a party will do nothing to hinder or obstruct another party from performing its obligations under the contract and that any such hindrance may constitute a breach of contract. No instruction was submitted on the issue of misuse.

Question No. 8 of Standard Havens' proposed special verdict asked, "Did Fort Howard hinder or obstruct Standard Havens' performance of the Contract? ANSWER: _____ Yes or No."

Fort Howard submitted in its proposed jury instructions its own modified version of Wisconsin Jury Instruction 3060. Fort Howard's proposed special verdict form contained no reference to the issues of hindrance and misuse. At the Court's jury instruction conference, Fort Howard submitted a proposed "misuse" special verdict.[8]

The Court's final version of the Special Verdict contained four questions dealing with the issues of hindrance and misuse.[9] The final version of the jury instructions contained instructions on these issues as well.[10] The jury returned answers to the hindrance and misuse issues generally in favor of Standard Havens.

Following the close of trial, Fort Howard brought a motion for entry of judgment or in the alternative a new trial, again challenging the use by Standard Havens of the hindrance and misuse defenses.

With this background of the dispute in mind, the Court turns to the legal positions of the two parties on the issues of hindrance and misuse.

## II.

In its motion filed just prior to trial, Fort Howard argued that the issues of hindrance and misuse should be excluded because it was too late for Standard Havens to raise the issues. Fort Howard also argued that misuse is not a recognized defense to warranty claims in Wisconsin and that burning of in-plant waste under the facts of this case cannot constitute misuse. These points were incorporated into Fort

---

**7.** Standard Havens' proposed jury instruction No. 9, read in its entirety:

HINDRANCE OR INTERFERENCE WITH PERFORMANCE

Defendant contends that Fort Howard through its misuse of the boiler/baghouse Facility and its failure to comply with the provisions of the Contract, hindered Standard Havens' performance under the Contract. If one person enters into a contract with another, there is an implied promise by each that he will do nothing to hinder or obstruct performance by the other. If cooperation is necessary for the performance of the Contract, there is an implied promise to give the necessary cooperation. Failure to cooperate may constitute a hindrance or obstruction of performance.

The implied promise is as binding as if spelled out and failure to fulfill the promise constitutes a breach of contract. The doing of acts or the failure to do acts which one party knows or ought to know would hinder or prevent the other from performing this obligation under the Contract may constitute such a breach.

Wis. JI—Civil 3060.

**8.** The standard practice of the Court is to hold a jury instruction conference with counsel toward the close of trial. The conference is held without a court reporter; however, the parties are later given an opportunity to make on the record objections to the Court's final version of the instructions.

**9.** *See* Questions No. 8 through 11 of Appendix A.

**10.** The jury received instructions on the issues of hindrance and misuse at pages 11 through 13 of the written version of the Court's instructions. The relevant portions are excerpted at Appendix B.

Howard's briefs on its post-trial motion. On the issue of when the defenses were raised, Fort Howard contended that it simply received no notice of the defenses in the pleadings as required by Rules 8 and 9 of the Federal Rules of Civil Procedure. Fort Howard further argued that under the procedure of this case, Standard Havens was not required to specify exactly what actions of Fort Howard were alleged to constitute misuse and hindrance until after the completion of trial.

Because Fort Howard had received no notice of the misuse defense, it was completely deprived of any opportunity, let alone an adequate opportunity, to prepare to meet these claims at trial. The result of allowing Standard Havens to raise these defenses at trial without affording Fort Howard any opportunity to prepare to meet them is that Fort Howard was denied a fair trial.

Fort Howard conducted its discovery in this case and prepared its case for trial based upon the pleadings and the defenses raised therein. Had Fort Howard known that it was defending a claim that it misused the baghouse it would have conducted discovery on that claim and retained an expert and presented expert testimony at trial that burning fuel oil and/or waste is not a misuse of a baghouse, but rather a common practice; that "reentrainment" often occurs in a baghouse because modules do, in normal operation, plug up; that an "adequate" dustcake was maintained on the bags at Fort Howard; and that "inefficient" burning of coal is not misuse but rather a normal and expected condition. Further, Fort Howard would have presented testimony from its own employees that Standard Havens never expressly conditioned the pressure drop warranty, nor gave any express warnings or instructions, against "misusing" the baghouse in the manner now alleged. Fort Howard was precluded from directly addressing these facts since Standard Havens *never* specified nor was required to specify what actions it claimed constituted misuse *until after* the conclusion of the evidence.

Brief in Support of Fort Howard's Alternative Motion For A New Trial, at 3–4. (Emphasis in original.)

In response to the pretrial motion of Fort Howard, Standard Havens argued that Fort Howard was attempting to secure a summary judgment in the form of the motion in limine. Standard Havens also argued that the defense of misuse is recognized under the Uniform Commercial Code, which was adopted by the State of Wisconsin. Standard Havens cited to the case of *Southern Illinois Stone Co. v. Universal Engineering*, 592 F.2d 446 (8th Cir.1979), as an example of a UCC case adopting the misuse defense.

Standard Havens did not squarely address the issue of whether the defenses were properly plead until oral argument on the morning of trial. At that time, Standard Havens pointed to paragraphs 9 and 19 of the Answer as provisions of a proper pleading for misuse and hindrance. This argument was detailed in Standard Havens' brief on the post-trial motions. That brief also argued that misuse had been raised in the joint Pretrial Report; that evidence of misuse was introduced at trial without objection; and that Fort Howard conducted discovery on the issues of misuse and hindrance, therefore a claim of prejudice was without merit.

### III.

■ The Court's analysis of whether the defenses of misuse and hindrance were properly pled will involve a three-step inquiry: first, in what form should the defenses of hindrance and misuse be characterized; second, in what form must the defenses of hindrance and misuse be pled; and third, was that form satisfied in the case at hand.

In characterizing the defenses of misuse and hindrance, the Court would begin by noting that Standard Havens at no time in the case made a satisfactory explanation of the distinction between the individual defenses or the application of each to this case. For example, Standard Havens relied on the case of *Southern Illinois Stone*

*Co. v. Universal Engineering*, 592 F.2d 446 (8th Cir.1979) as support for both defenses. *Southern Illinois Stone* held that under the Uniform Commercial Code, as adopted by Illinois, recovery for breach of warranty may be denied where the buyer's misuse of the goods has been the proximate cause of the alleged breach. But the case no where referred to hindrance as a defense to a breach of warranty claim. Furthermore, at trial Standard Havens filed no jury instruction or special verdict question on the issue of misuse. Rather, an instruction on hindrance, taken from Wisconsin Civil Jury Instruction 3060, was submitted. That instruction has its roots in a series of patent cases dating back more than 50 years. One such case, *Gessler v. Erwin Co.*, 182 Wis. 315, 193 N.W. 363 (1923), held that each party to an exclusive license agreement impliedly agreed not to do acts tending to prevent performance by the other.

Since Standard Havens has pointed to both paragraphs 9 and 19 of its Answer, the Court assumes that it characterizes the hindrance and misuse defenses as part of its denial of Fort Howard's complaint and as an affirmative defense to Fort Howard's complaint. If the defenses are part of the denial of the complaint, the Court sees no other way to characterize them than as a condition precedent. That is: the baghouse did not work properly because Fort Howard failed to perform its obligations under the contract; those obligations, including the implied promises not to misuse or hinder, had to be met before Standard Havens' obligation under the Pressure Drop Warranty arose. This explanation does not exactly square with the traditional definition of a condition precedent.[11] Still, the issue before the Court is generally one of procedure. Furthermore, the distinction between a condition precedent and other defenses, as will be seen below, is not always clear cut. Therefore, the Court will characterize the defenses of misuse and

hindrance as part of both Standard Havens' denial of the breach of warranty claims and as part of an affirmative defense to the claims. Further substantive characterizations of the defenses will be made below within both general divisions.

If the defenses were a condition precedent, their pleading is covered by Rule 9(c) of the Federal Rules of Civil Procedure. Under Rule 9(c), a party may generally aver that all conditions precedent have been performed; however, a denial by the opposing party of a condition precedent "shall be made specifically and with particularity."

A party who intends to controvert the claimant's general allegation of performance is thus given the burden of identifying those conditions he believes are unfulfilled and wishes to put in issue; he cannot raise an issue of nonperformance by a general denial. However, if the claimant fails to allege performance of conditions precedent, matters normally put in issue by a specific denial need not be asserted as affirmative defenses in order to be preserved. Because in most cases no question will be raised as to the performance of conditions precedent, Rule 9(c) has the effect of forcing a defendant to raise the issue whenever he believes there actually is a question about performance. This distribution of the pleading burden does not affect or shift the burden of proving performance or occurrence, which generally will be on the plaintiff as to any condition challenged by defendant.

Rule 9(c) only requires a denial of those matters that must be performed or have occurred as a prerequisite to suit. Thus, when matters of affirmative defense, such as the occurrence of conditions subsequent, are mistakenly designated as denials of conditions precedent, the court should treat them as if they had been properly pleaded. This leniency seems appropriate since it is often

---

**11.** "Where the seller's liability for breach of warranty is predicated on the performance of certain conditions by the buyer, the performance of such acts by the buyer is a condition precedent to his invoking the breach of warran-

ty in a suit based directly on the warranty, or by way of recoupment or counterclaim or defense to an action by the seller."

   77 *Corpus Juris Secundum* § 356, p. 1265 (1952).

difficult to distinguish between conditions precedent and subsequent; moreover, the specific and particular denial of the latter, even when it is not called for, does fulfill a pleading function by narrowing the issues and notifying the claimant of some of the defenses he may be obliged to meet at trial.

Wright and Miller, *Federal Practice and Procedure*, § 1304 (1969) (footnotes omitted).

Construing hindrance and misuse as affirmative defenses puts their pleading under the requirements of Rule 8(c). Rule 8(c) states that all affirmative defenses must be pleaded.

> The general rules of pleading that are applicable to the statement of a claim also govern the statement of affirmative defenses.... An affirmative defense may be pleaded in general terms and will be held to be sufficient, and therefore invulnerable to strike, as long as it gives plaintiff fair notice of the nature of the defense. The only exceptions are those pleading provisions in Rule 9, especially Rule 9(b), which deals with fraud, mistake, and conditions of mind.

*Id.* at § 1274, pp. 323–324 (footnote omitted).

At paragraph 9 of the Answer, Standard Havens denied Fort Howard's claim that Fort Howard had fulfilled all of its obligations under the contract. Paragraph 9 then added that "Standard Havens states specifically and with particularity that Fort Howard has failed to perform" 17 different obligations under the contract. An 18th obligation was listed in catch-all form: "(r) all other requirements of the Contract which have not been performed by Fort Howard." A further catch-all was made by Standard Havens at paragraph 19.

Wisconsin case law makes clear that absence of hindrance is an implied contractual obligation.[12] Thus, when Standard Havens points to specific allegations under Paragraph 9 of the Answer, it points to Fort Howard's failure to perform certain obligations explicit in the contract, such as failure to follow certain operational standards. By definition, these explicit contractual obligations are not implied. Therefore, the Court concludes that if hindrance was plead at all, it was done so in the catch-all allegations of paragraphs 9(r) and 19.

Assuming the absence of hindrance was a condition precedent to Fort Howard's recovery for breach of warranty, there can be no doubt that Standard Havens would have had to deny this condition precedent specifically and with particularity. The Court finds that the catch-all phrasing of paragraphs 9(r) and 19 in no way met this requirement.

As to whether hindrance was properly plead as an affirmative defense, the Court finds that the catch-all phrasing did not serve to give Fort Howard fair notice. Certainly a general allegation of "hindrance" in the Answer would have sufficed. *See* Wright and Miller, at § 1274. But in the case at hand, that type of general pleading was put even more generally: Fort Howard "failed to fulfill its obligations under the Contract." Answer at Paragraph 19. Therefore, the Court finds the defense of hindrance was not properly pleaded. The Court next turns to an analysis of the misuse defense.

If the Court were to construe the misuse defense as conditions precedent that were not met, the Court again would be hard pressed to find where in the complaint the allegations of misuse that resulted in Special Verdict Question No. 9 were pleaded specifically and with particularity. As shown above, the particular provisions of Paragraph 9 nowhere referred to a minimum dustcake requirement, the burning of fuel oil in the cyclone bag, the burning of waste chemicals in the boilers, an inefficient burning of coal, a reentrainment or the operating of the baghouse with more than two modules off-line—the specific inquiries of Question No. 9. Therefore, the Court finds that if the defense of misuse as put forth in Question No. 9 is construed as a denial of conditions precedent, the precise

---

**12.** *See* Wis. J.I. 3060 and citations therein.

inquiries of Question No. 9 were not pleaded specifically and with particularity.

As with hindrance, misuse as an affirmative defense was not pleaded generally in the form of the word "misuse" appearing in the answer. The issue then becomes whether the catch-all phrasing of paragraph 19 suffices. The Court concludes that it does not. Stating simply that Fort Howard has not complied with its obligations under the contract in no way fairly or properly alerts Fort Howard that misuse is an issue in the case.

A review of the cases dealing with the defense of misuse confirms that misuse as a defense does not arise from failure to perform a contractual obligation. In the *Southern Illinois Stone Co.* case, relied on by Standard Havens for the proposition that there is a misuse defense, the court was faced with a situation ·where there were two possible causes for the failure of rock-crushing equipment to work as warranted. The seller contended that the use of dynamite in the mouth of the crusher barred recovery under the warranty as a matter of law. The Court rejected this holding, finding that an improper design was the primary cause of the deficiency, not the use of the dynamite, and recovery was allowed. The court in no way referred to misuse as an obligation separate or inherent in a contract. Nor do the cases cited in *Southern Illinois* establish that the duty not to misuse the product is an obligation that is implied in the terms of the contract. Rather, misuse is used to establish a further inquiry for recovery based on breach of warranty: whether the breach of warranty was the proximate cause of the damages. That is, if the breach of warranty was not the proximate cause of the damages, the resulting damages were beyond the scope of the warranty. *See, for example, Burrus v. Itek Corp.,* 46 Ill.App.3d 350, 4 Ill.Dec. 793, 360 N.W.2d 1168 (modification of printing press by buyer did not bar recovery for breach of warranty where evidence showed that press was defective prior to modification); *see also, Chisolm v. J.R. Simplot Co.,* 94 Idaho 628, 495 P.2d 1113 (1972) (recovery for breach of warranty on weed killer barred where buyer failed to show that breach was proximate cause of resulting weeds).

Thus the Court is left with the conclusion that misuse is properly pleaded not as a failure on the part of the buyer to fulfill his obligations under the contract, but rather as an allegation that the breach of warranty was not the proximate cause of the alleged damages. Clearly, paragraphs 9 and 19 in no way make this allegation.

**IV.**

Under Rule 9(c), a denial of a condition precedent that is not made specifically and with particularity must be stricken. *See Evaluation Systems, Inc. v. Aetna Life Insurance Co.,* 555 F.Supp. 116, 122 (N.D.Ill.1982) (general denial of plaintiff's claim that every condition of insurance policy was fulfilled stricken for failure to properly apprise plaintiff of defendant's claim that full premium had not been paid). Under Rule 8(c), any affirmative defense not pled is waived. *Cornelius v. LaCroix,* 631 F.Supp. 610, 618 (E.D.Wis.1986) (*citing Pinto Trucking Service, Inc. v. Motor Dispatch,* 649 F.2d 530, 534 (7th Cir.1981)).

Failure to comply precisely with Rule 8(c) is not fatal to a defense if the defense is raised in the trial court in a manner that does not result in unfair surprise. *Allied Chemical Corporation v. Mackay,* 695 F.2d 854, 855–56 (1983). Furthermore, Rule 15(b) permits an amendment of the pleadings to conform to the evidence arising at trial:

> (b) **Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the

ground that it is not within the issues made by the pleadings, the court may alow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Standard Havens argues that any defect in pleading was cured by the Final Pretrial Report or by the evidence actually introduced at trial. As to the Final Pretrial Report, Standard Havens points to the following language as notice of the "misuse" defense being clearly set forth.

In addition to the above issues, Standard Havens contends that the reason that the pressure drop exceeded six inches was that the facility was operated outside the parameters of one or more of the conditions [of the contract] listed at paragraphs A(1), (4), (7), (8), (10), (11) and (15) and as to each such occasion the bags were irreversibly damaged and coated or blinded and that such operation rendered the pressure drop warranty null and void. Fort Howard denies that the facility was so operated and that the warranty was rendered null and void.

Final Pretrial Report, Part C, at 4. Fort Howard responds (1) that this language does not disclose the misuse defense; (2) that a final pretrial report, as opposed to the pretrial order used in *Allied Chemical,* cannot be used to amend defective pleadings; and (3) the first time the actual words "misuse" and "hindrance" were used by Standard Havens was in a brief in opposition to the motion in limine filed by Fort Howard as a result of the final pretrial conference.

The Court agrees that the language of the pretrial report did not "clearly" disclose the defenses of hindrance and misuse.[13] At best, Standard Havens simply put forth

the bare legal conclusion that under certain circumstances, the Pressure Drop Warranty was rendered void. At worst, the Court has a pretrial brief that confuses the legal distinction between hindrance and misuse and ignores their specific application to a breach of warranty claim. Accordingly, the Court concludes that the raising of the hindrance and misuse defenses in the manner of the pretrial report language excerpted above did not properly alert Fort Howard that they were issues in the case. In fact, the Court has no doubt that the language did not properly alert the Court that they were issues. Thus, Standard Havens is left with the argument that its brief in opposition to the motion in limine properly introduced the issues of hindrance and misuse. But the Court again must point to the confusing nature in which the defenses were argued. For example, Standard Havens' Response In Opposition To Plaintiff's Motion In Limine puts forth a one paragraph explanation of the application of hindrance to this case, stating in part that hindrance "would in essence be equivalent to misuse, and thus a defense to the breach of warranty claim." Standard Havens' Response brief at 29. Furthermore, the brief was filed a mere two weeks before trial (albeit pursuant to the Court's briefing schedule). The Court also finds relevant to Standard Havens' confusion on these issues the fact that Standard Havens submitted no proposed jury instruction on misuse. All of the these points leads the Court to conclude that Standard Havens' presentation of the issues of hindrance and misuse through the Final Pretrial Report and through a subsequent written brief in no way cured the defective pleading in this case.

■ Standard Havens also claims that evidence relating to misuse and hindrance were admitted without objection at trial, thus Rule 15(b) should be invoked by the Court. The Court rejects this contention

---

**13.** The description of the defenses as "clearly" set forth in the Final Pretrial Report was used by Standard Havens at page 5 of its Brief in Opposition to Fort Howard's motion for Judgment N.O.V. Or, In The Alternative, A New Trial.

since the Court clearly reserved ruling on the defenses immediately prior to trial.[14]

## V.

■ Fort Howard's post-trial challenge to the use of hindrance and misuse was in the form of a motion under Rules 50(b) and 58 for judgment on the verdict or, in the alternative, a motion for a new trial under Rule 59.[15] The motion for entry of judgment seeks to strike the Special Verdict questions on misuse and hindrance.

■ The Court finds that based on the circumstances of this case, the appropriate course of action is a new trial under Rule 59. A motion for a new trial falls within the sound discretion of the district court. *Cole v. Bertsch Vending Co.*, 766 F.2d 327, 332 (7th Cir.1985). If the district court believes that a fair trial has not been had, it is the inherent right of the court under Rule 59 to set aside a jury's verdict and order a new trial. *St. Clair v. Pipal*, 611 F.Supp. 911, 915 (E.D.Wis.1985) (*citing Cecil Corley Motor Company v. General Motors Corporation*, 380 F.Supp. 819, 859 (M.D.Tenn.1974)). Furthermore,

The draftsmen of the rules found that it was impracticable to enumerate all the grounds for a new trial. Thus the rule is stated in broad terms. It has been said that the general grounds for a new trial are that the verdict is against the weight of the evidence, that the damages are

---

**14.** Standard Havens further argues that Fort Howard conducted discovery on the hindrance and misuse issues and therefore it was not prejudiced by the introduction of these issues at trial. The Court's review of the discovery material in question leads the Court to conclude that the material does not touch exclusively on the issues of hindrance and misuse. Furthermore, the Court does not see how Fort Howard's discovery on material relevant to misuse and hindrance can cure the improper pleading at hand. The discovery of Fort Howard would have become an issue had Standard Havens moved to amend the pleading.

**15.** Rules 50(b), 58 and 59(a) read as follows:
*Rule 50(b)*
**Motion for Judgment Notwithstanding the Verdict.** Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the veridct and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with the party's motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested

verdict had been directed or may order a new trial.
*Rule 58*
Subject to the provisions of Rule 54(b): (1) upon a general verdict of a jury, or upon a decision by the court that a party shall recover only a sum certain or costs or that all relief shall be denied, the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the court; (2) upon a decision by the court granting other relief, or upon a special verdict, or a general verdict accompanied by answers to interrogatories, the court shall promptly approve the form of the judgment, and the clerk shall thereupon enter it. Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a). Entry of the judgment shall not be delayed for the taxing of costs. Attorneys shall not submit forms of judgment except upon direction of the court, and these directions shall not be given as a matter of course.
*Rule 59(a)*
A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

excessive, or that for other reasons the trial was not fair, and that the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions. The absence of a listing of specific grounds should not obscure the governing principle. The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice.

Wright and Miller, at § 2805. The defenses of misuse and hindrance, in the forms presented by Standard Havens and resulting in Special Verdict Questions No. 8 through 11, should have been stricken. Instead, the trial proceeded with Standard Havens relying on their use, Fort Howard scurrying to meet their presentation, and the Court sitting in befuddlement as to what issues were actually in dispute.[16]

## VI.

It is the rare civil case that proceeds to trial in this Court without a resolution of a fully-briefed dispositive motion. The motion not only narrows the disputed issues of a particular case, but also alerts the Court and the parties as to precisely what issues are in dispute. This case presents the danger of pursuing an alternative litigation strategy.

Standard Havens' defenses of misuse and hindrance to Fort Howard's breach of warranty claim were not properly pleaded. Furthermore, they were not added to the case through a proper amendment of the pleadings.[17] Accordingly, the misuse and hindrance issues were improperly placed before the jury. The Court hereby GRANTS Fort Howard's motion for a new trial. The new trial will not include any issues not properly pleaded.

---

**16.** The Court would opine that while it agrees with Fort Howard that striking Questions 8 through 11 would lead to a judgment for Fort Howard under Rules 50 and 58, the Court declines to take such a course of action. The circumstances of this case, including the Court's failure to rule on the dispute prior to trial as

## APPENDIX A

### SPECIAL VERDICT

**QUESTION NO. 1**

Did the parties intend and agree the conditions to the Pressure Drop Warranty to be contained solely in Section I.22(C)(2) and I.22(D) of the contract?

ANSWER: _Yes_
        Yes or No

If your answer to Question No. 1 is "No", then answer this question; otherwise proceed to Question No. 4.

**QUESTION NO. 2**

Did the parties intend and agree that Section I.2 of the contract was also to be applied to the Pressure Drop Warranty?

ANSWER: _N/A_
        Yes or No

If your answer to Question No. 2 is "Yes", then answer this question; otherwise proceed to Question No. 4.

**QUESTION NO. 3**

Did the parties agree and intend that the following provisions of Section I.2 were conditions to the Pressure Drop Warranty? N/A

a) Emission Source: Six (6) Boilers?
   ANSWER: ___
        ("Yes" or "No")

b) Gas Volume: 771,981 acfm?
   ANSWER: ___
        ("Yes" or "No")

c) Temperature: 365 [degrees] F. (275 [degrees] F.—475 [degrees] F.)?
   ANSWER: ___
        ("Yes" or "No")

d) Fuel: Bituminous and subbituminous coal, petroleum coke (20% BTU input) inplant waste and/or RDF 15% BTU input?
   ANSWER: ___
        ("Yes" or "No")

---

well as the time constraint imposed by the Court at trial leads the Court to find that a new trial is the appropriate course of action.

**17.** The Court makes no ruling as to whether misuse is a recognized defense to a breach of warranty claim under Wisconsin law.

e) Type of Firing: Cyclone, underfeed stoker, spreader stoker, and waste incinerator?
ANSWER: ___
("Yes" or "No")

f) Inlet Loading: 1.0 to 3.5 gr/ACF?
ANSWER: ___
("Yes" or "No")

g) Number of Modules: 28 (2–14 Module systems)?
ANSWER: ___
("Yes" or "No")

h) Total No. Bags Per Module: 210?
ANSWER: No
("Yes" or "No")

i) Bag Size: 5.7" × 19' = 28.35 sq. ft.?
ANSWER: No
("Yes" or "No")

j) Air-to-Cloth Ratio, Gross: 4.63 to 1?
ANSWER: No
("Yes" or "No")

k) Air-to-Cloth Ratio, Net, One Module Off–Line for Cleaning: 4.8 to 1?
ANSWER: No
("Yes" or "No")

l) Air-to-Cloth Ratio, Net, Two Modules Off–Line for Cleaning: 4.99 to 1?
ANSWER: ___
("Yes" or "No")

m) Cloth Area Total: 166,712 Ft. [Squared]?
ANSWER: No
("Yes" or "No")

n) Cloth Area, Net, With One Module Off–Line: 160,758 Ft. [Squared]?
ANSWER: No
("Yes" or "No")

o) Cloth Area, Net, With Two Modules Off–Line: 154,804 Ft. [Squared]?
ANSWER: No
("Yes" or "No")

p) Cloth Area Per Module: 5,954 Ft. [Squared]?
ANSWER: No
("Yes" or "No")

q) Compressed Air Required (110 psig): 260 scfm?
ANSWER: ___
("Yes" or "No")

r) Overall System Dimensions—L × W × H: 87' × 64' 2" (Incl. Cranes) × 51' 6-1/4" (Including Cranes)?
ANSWER: No
("Yes" or "No")

s) Peak Capacity (Steam Generation): 1,357,000 lb./hr.?
ANSWER: ___
("Yes" or "No")

## QUESTION NO. 4

Did the Baghouse, as provided by Standard Havens, operate with a pressure drop in excess of 6" water column?
ANSWER: Yes
("Yes" or "No")

If your answer to Question No. 4 is "Yes", then answer Questions No. 5, 6 and 7.

## QUESTION NO. 5

When the Baghouse operated with a pressure drop in excess of 6" water column, were the conditions of the Pressure Drop Warranty in I.22 (C)(2) and (D) and those you found applicable, if any, in Questions 2 and 3 met?
ANSWER: Yes
("Yes" or "No")

## QUESTION NO. 6

Could Standard Havens have repaired the Baghouse within a reasonable period of time so that the Baghouse would meet the Pressure Drop Warranty?
ANSWER: No
("Yes" or "No")

## QUESTION NO. 7

Was it the mutual opinion of Standard Havens and Fort Howard that it was impractical to make the Baghouse perform as warranted?
ANSWER: No
("Yes" or "No")

Regardless of how you answered any of the above questions, answer the following:

## QUESTION NO. 8

Did Fort Howard breach its implied promise not to hinder or obstruct Standard Havens' performance of the contract by:

a) Failing to allow Standard Havens to be present during testing and to review test data?

ANSWER: Yes
("Yes" or "No")

b) Failing to cooperate by not giving Standard Havens information?

ANSWER: No
("Yes" or "No")

## QUESTION NO. 9

Did Fort Howard misuse the Baghouse by:

a) Failure to maintain an adequate dust-cake on the bags?

ANSWER: Yes
("Yes" or "No")

b) Burning fuel oil in the cyclone boiler?

ANSWER: No
("Yes" or "No")

c) Burning waste chemicals in the boilers?

ANSWER: Yes
("Yes" or "No")

d) Inefficient burning of coal?

ANSWER: Yes
("Yes" or "No")

e) Reentrainment?

ANSWER: Yes
("Yes" or "No")

f) Operating the Baghouse with more than two modules off-line?

ANSWER: No
("Yes" or "No")

If you answered any of the subparts of Question No. 9 "Yes", then answer this question:

## QUESTION NO. 10

Was the misuse found by you a cause of the pressure drop problem?

ANSWER: Yes
("Yes" or "No")

If you answered Question No. 5 "Yes", there was a breach of warranty; if you answered Question No. 10 "Yes", there was a misuse. If you answered each of those questions "Yes", answer the following:

## QUESTION NO. 11

Which of the following contributed more to the cause of the Baghouse pressure drop problem:

a) Breach of warranty by Standard Havens?

b) Misuse by Fort Howard?

ANSWER B
("A" or "B")

## QUESTION NO. 12

What is the difference in the value between the Baghouse actually provided by Standard Havens and a Baghouse that meets the Pressure Drop Warranty?

ANSWER: $411,600.00

## QUESTION NO. 13

What sum of money will reasonably compensate Fort Howard for consequential damages incurred by the failure of the Baghouse to meet the Pressure Drop Warranty?

ANSWER: $ 0

We the jury unanimously find the facts to be as indicated in our answers to the foregoing questions.

_____
(FOREPERSON)

_____
JUROR

_____
JUROR

_____
JUROR

_____
JUROR

_____
JUROR

_____
JUROR

Dated at Milwaukee, Wisconsin this 30th day of September, 1987.

After you have placed your signatures on the lines indicated, notify the bailiff that you have reached a verdict.

## APPENDIX B

Question No. 8 deals with an issue of hindrance or interference.

If one person enters into a contract with another, there is an implied promise by each that he will do nothing to hinder or obstruct performance by the other. If cooperation is necessary for the performance of the contract, there is an implied promise to give the necessary cooperation. Failure to cooperate may constitute a hindrance or obstruction of performance.

The implied promise not to hinder is as binding as if spelled out and failure to fulfill the promise constitutes a breach of contract. The doing of acts or the failure to do acts which one party knows or ought to know would hinder or prevent the other from performing his obligations under the contract may constitute such a breach.

But if hindrance or obstruction of the performance of a party is reasonably necessary or was contemplated at the time the contract was made, it would not be considered a breach. The conduct of a party which may have been sufficient to hinder or prevent performance by the other party to a contract does not constitute a breach if the other party would not have performed in any event.

If you find that Fort Howard breached its implied promise not to hinder or obstruct Standard Havens' performance of the contract, you should answer Question No. 8, "yes."

Standard Havens claims that Fort Howard misused the baghouse and caused the pressure drop problem through that misuse. The law defines misuse of a product as use of the product in violation of express conditions, warnings or instructions against such use. It is the use of the product in a way contrary to an express condition or warning in the warranty or an instruction to the contrary that constitutes misuse. Misuse cannot be implied.

Special verdict Question No. 10 is a cause question which inquires as to whether or not there was a causal connection between any misuse of the baghouse which you may have found in your answers to subparts of Question 9 and the pressure drop problem. Notice that this question does not ask about *"the* cause," but rather *"a* cause." The reason for this is that there may be more than one cause of a pressure drop problem. Before you can find that an alleged misuse was a cause of the pressure drop problem, you must find that the alleged misuse was a substantial factor, that is, that it had a substantial influence in producing the pressure drop problem.

Question No. 11 requires that in the event you found a breach of warranty and a misuse, you must then compare the comparative causal impact of these two factors on the pressure drop problem. Question No. 11 asks you which of these factors contributed more.